IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JORDAN S. & MADISON S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JORDAN S. & MADISON S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ASHLEY S., APPELLANT.

Filed January 27, 2026.    No. A-25-274.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Nicole Cavanaugh for appellant.

Alexis Homme, Deputy Douglas County Attorney, for appellee.

Kelli M. Hauptman, guardian ad litem.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Ashley S. appeals from the order of the separate juvenile court of Douglas County, which terminated her parental rights to her children, Jordan S. and Madison S. Upon our de novo review of the record, we affirm the juvenile court's order.

## II. STATEMENT OF FACTS

### 1. REMOVAL AND ADJUDICATION

Ashley and Taylor S. are the parents of Jordan and Madison, born in 2016 and 2017, respectively. Taylor was incarcerated in Iowa at the time of the termination hearing in this case

and is not involved in this appeal. The children were removed from Ashley's care on January 26, 2023, due to allegations of drug use and/or possession by Ashley and her boyfriend in the children's presence. The children have remained in out-of-home placement since their removal.

On January 27, 2023, the State filed a juvenile petition alleging that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that they lacked proper parental care due to Ashley's fault or habits and were at risk of harm. Specifically, the State alleged that law enforcement observed Ashley's boyfriend snort a substance while Ashley and the children were in the vehicle with him; law enforcement observed controlled substances and/or paraphernalia in the vehicle; Ashley's use and/or possession of controlled substances and/or alcohol placed the children at risk for harm; Ashley had failed to provide the children with proper parental care, support, supervision, and/or protection; and at the time of the children's removal, there was no one appropriate who could legally provide for the care, support, supervision, and/or protection of them. The affidavit attached to the State's ex parte motion for immediate custody, filed the same day, indicates that on January 26, Ashley's boyfriend was under surveillance by law enforcement due to an active federal indictment for distribution of fentanyl resulting in serious bodily injury. Officers observed the boyfriend drive to and park at a business while Ashley and the children were in the vehicle. After observing the boyfriend snort an unknown substance, officers arrested the boyfriend and Ashley and removed the children from Ashley's care. Possible drugs and paraphernalia were found in the vehicle. The court granted the State's ex parte motion and placed the children in the temporary custody of the Nebraska Department of Health and Human Services (the Department). The children have been in foster care placement with their maternal grandmother since their removal from Ashley's care.

A first appearance and protective custody hearing was held on February 3, 2023. Ashley entered a denial of the State's allegations against her. The juvenile court ordered the Department to offer Ashley voluntary services, including agency supervised visitation, chemical dependency and psychological evaluations, family support, and drug testing.

An adjudication and dispositional hearing was held on March 6, 2023. Ashley withdrew her denial and admitted to the allegations that the children were at risk for harm due to her use and/or possession of controlled substances or alcohol and her failure to provide them with proper parental care, support, supervision, and protection. The State dismissed the remaining counts of the petition. The juvenile court then adjudicated the children as being within the meaning of § 43-247(3)(a). The court ordered that the children remain in the care and custody of the Department with placement to exclude Ashley's home, and the court ordered Ashley to undergo a chemical dependency evaluation and a psychological evaluation, obtain and maintain a legal source of income and safe and adequate housing, cooperate fully with a family support worker, maintain contact with all case professionals, and sign releases as requested. The permanency objective at that time was reunification.

2. DISPOSITION AND REVIEW

Following a continued disposition hearing on March 29, 2023, the juvenile court ordered Ashley to enroll in and successfully complete "Level 3.5 Long Term Residential Treatment"; obtain and maintain a legal source of income and safe and adequate housing; cooperate fully with a family support worker; undergo a psychological evaluation; maintain contact with all case

professionals; sign releases as requested; attend Alcoholics Anonymous/Narcotics Anonymous meetings on a weekly basis and provide proof of attendance; enroll in and successfully complete a parenting class as arranged by the Department; participate in agency-supervised visitation; not possess or ingest alcohol and/or controlled substances unless prescribed; undergo random, frequent, observed drug testing a minimum of three times per week as arranged by the Department; and allow no contact between the children and her boyfriend.

The juvenile court entered similar orders at subsequent status check and review and permanency planning hearings, but it modified and/or added to its orders as follows. On May 26, 2023, the court received an updated chemical dependency evaluation and drug testing report and ordered Ashley to enroll in and successfully complete "Level 2.1 Intensive Outpatient Treatment." On July 3, the court ordered that visitation between Ashley and the children was "to be a mix of agency supervised visits and visits supervised by other individuals" as approved by the Department. On September 5, the court ordered Ashley to participate in unsupervised and overnight visitation with the children; participate fully in "Dialectical Behavioral Therapy (DBT)"; and follow all therapeutic recommendations.

On December 19, 2023, the juvenile court ordered Ashley to immediately submit to a hair follicle test as arranged by the Department. And, on January 11, 2024, the court ordered a return to supervised visitation between Ashley and the children, with no overnight visitation. The court also ordered that Ashley not transport the children; that she undergo an updated chemical dependency evaluation and follow its recommendations; that the Department arrange for Ashley to submit to drug testing, in addition to her drug testing through probation; and that Ashley submit to a hair follicle or fingernail drug test.

Following a review and exception hearing on May 22, 2024, the juvenile court found an exception to the requirement that the State file a motion for termination of parental rights, given that the children continued to be placed with a relative. The permanency objective at that time was reunification with a concurrent plan of adoption. Ashley was again ordered to submit to a hair follicle or fingernail drug test. The court also ordered her to enroll in and successfully complete "Level 3.5 residential treatment" and undergo relinquishment counseling.

### 3. TERMINATION PROCEEDINGS

#### (a) Motion

On October 10, 2024, the State filed a motion to terminate Ashley's parental rights to the children. The State alleged grounds for termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination of Ashley's parental rights was in the children's best interests. With respect to § 43-292(6), the State specifically alleged that Ashley had failed to consistently obtain and maintain safe, appropriate, and adequate housing and provide proof to the case manager; obtain and maintain a stable and legal source of income and provide proof to the case manager; consistently participate in drug testing; complete a hair/or nail follicle test; attend AA/NA and provide proof of attendance; complete DBT; follow all current treatment and therapeutic recommendations; consistently visit her children; consistently meet with and participate in family support services; maintain consistent contact with case professionals; and place herself in a position to safely parent her minor children despite being provided reasonable efforts.

On January 24, 2025, Ashley filed a motion to continue the termination hearing, which had been scheduled for February 14, stating that she was participating in a treatment program and would be unable to attend termination hearing and requesting the opportunity to be present at the hearing.

(b) Hearing

The juvenile court heard Ashley's motion to continue at the start of the February 14, 2025, termination hearing and received a letter from the director of the treatment program in which Ashley was enrolled, confirming her enrollment. The court denied Ashley's request for a continuance and proceeded with the termination hearing. The court received various documentary exhibits offered by the parties and heard testimony from the foster mother, two drug testing providers, the children's therapist, and the current Department case manager assigned to the case.

Jennifer Martinez was the current Department case manager, taking over from the previous case manager in August 2023. Martinez confirmed that the children entered foster care on January 26, 2023, and had remained in out-of-home placement with their maternal grandparents since that time. Martinez testified about the Department's provision of services to Ashley and Ashley's completion of or her failure to comply with these court orders.

*(i) Drug Use and Testing*

Ashley did not comply with the order for random drug testing, only testing when she was admitted to treatment facilities. Upon her admission to one treatment facility in the fall of 2024, she tested positive for amphetamines, ecstasy, methamphetamines, and cannabis. Ashley was on probation during this case until the end of September 2024. She participated in UAs through probation, testing negative for all substances until sometime in November 2023, when she stopped reporting for testing. Sometime near the end of 2023, Ashley's probation officer reported to Martinez that Ashley had tested positive for methamphetamine. Ashley admitted several relapses to Martinez in 2024. Ashley did not successfully complete the court-ordered hair follicle or nail follicle drug test. In addition to Martinez, several witnesses testified about Ashley's substance use issues.

The foster mother, Ashley's mother, testified about Ashley's current substance use as well as some of the mental health and substance abuse issues Ashley experienced while in high school. The foster mother testified that sometime in the previous 6 months Ashley admitted to her that she "has a problem" and was using "[h]eroin, meth, that kind of stuff." According to the foster mother, Ashley was hospitalized in November 2024 and had to be given "several doses of Narcan." The juvenile court received this testimony for the foster mother's "understanding as to why [Ashley] was hospitalized." The foster mother noted that Ashley had been struggling with substance abuse and mental health issues since she was in middle school or high school. She also noted Ashley's long-term history of starting treatment and not completing it.

Sarah Valentine was a supervisor at an agency to which the Department referred Ashley for drug testing in April 2023 and again in February 2024. The agency offered Ashley a total of 11 drug tests between the two referral periods; she did not complete any of these tests. According to Valentine, Ashley was discharged after the first referral period for declining testing twice. She

was discharged after the second referral period once she reached 30 consecutive days of noncompliance.

Shana Clapper, the owner and operator of a drug and alcohol screening provider, testified about her interactions with Ashley after the Department referred Ashley to Clapper's agency for hair follicle testing at the end of December 2023. Upon accepting the referral, Clapper contacted Ashley on January 2, 2024, and advised her that her hair had to be chemically-free (no dye and no bleach), clean, and dry for the collection process. Ashley agreed, and the first specimen collection was scheduled for January 8. Clapper was unable to collect a hair follicle specimen on that date because Ashley's hair "was colored." Ashley told Clapper that she had colored her hair 5 days prior. Clapper did not make any other attempts to collect a hair follicle sample.

Subsequently, the Department referred Ashley to Clapper's agency for nail follicle testing. Clapper had offered to collect a nail follicle sample during their contact on January 8, 2024, and informed Ashley about the procedure and requirements at that time. Clapper "had the discussion" again with Ashley over the phone when they arranged a collection date of January 15. Clapper was unable to collect a nail follicle sample from Ashley on January 15 because Ashley's fingernails and toenails were "covered with polish." Ashley told Clapper that she "would not be paying to have the acrylic removed" from her fingernails, and she refused to use Clapper's product to remove the toenail polish because "her children had painted her nails." Clapper attempted to collect a nail follicle sample again on February 5, but at that time, there was "a hard substance on the top of the [finger]nail" and "not much free edge;" Ashley's toenails appeared to have been trimmed and were still painted. When Clapper discussed the issue with Ashley, she "became frustrated," told Clapper "'whatever,'" and said that she "didn't care."

On February 19, 2024, Clapper made one more unsuccessful attempt to collect a nail follicle sample. At that time, Ashley's nails were covered with an "acrylic-type substance" that was "hard and rough." According to Clapper there was "some paint" and it was not possible to take a sample from either Ashley's fingernails or toenails. When Clapper spoke with Ashley about these issues, Ashley "became upset," raised her fist in the air, called Clapper "some names" and "used some profanities," yelled at Clapper, and slammed the door as Clapper left. After this incident, Clapper refused to take further referrals from the Department regarding Ashley.

*(ii) Treatment/Therapeutic Recommendations*

Ashley obtained several substance abuse evaluations, some of which recommended residential treatment and some of which recommended intensive outpatient (IOP) treatment. Some of the evaluations were obtained after referrals by the Department, and some were pursued by Ashley on her own in apparent attempts to get a different recommendation. She told Martinez several times that she did not want or think she needed residential treatment. Ashley entered several treatment programs before the termination motion was filed, but she did not complete any of them, having difficulty following the program rules and sometimes leaving against medical advice. She entered a program for IOP treatment shortly prior to the termination hearing and presented evidence of her participation in that program, which we discuss below. Martinez expressed her concern that Ashley had not completed the court-ordered treatment and had not shown her willingness to take accountability for the reason why the children came into care.

In addition to substance abuse treatment, Ashley was ordered to participate in DBT and attend AA/NA. Ashley participated in DBT through probation but did not complete it, attending only about 15 out of more than 20 total sessions. Ashley was discharged from that program for increasing absences. According to Martinez, Ashley also never provided proof that she consistently attended AA.

### (iii) Income/Housing

Ashley never asked for Martinez' assistance in obtaining employment. Ashley reported two sources of income to Martinez. Ashley reported working at Roll Enterprises and provided pay stubs from May and June 2023. Ashley was also employed at H&R Block from December 2023 to April 2024. Ashley reported other jobs to Martinez without providing any verification. Martinez had not received any verification of Ashley's employment since April 2024, and Martinez did not know if Ashley was employed at the time of the termination hearing. Martinez expressed her opinion that Ashley had not shown she was financially able to provide for the children's needs.

Martinez conducted walk-through inspections of two different addresses provided by Ashley during this case. Martinez walked through and approved the residence of Ashley's grandmother in September 2023; she completed a walk-through of an apartment Ashley planned to rent with a friend in December 2023. Ashley had not provided Martinez with any address for where she was staying since December 2023, although she reported at various points to staying with friends or in hotels or being "homeless." She was also incarcerated twice for probation violations, first between April and May 2024, and then again between August and September 2024.

### (iv) Visitation and Children

The record shows that Ashley made good progress during visitation with the children in 2023. Some of the visits in 2023 were supervised by the foster mother, but the Department implemented agency supervision at some point, so the foster mother would not "be in the middle." By December, Ashley was allowed unsupervised and overnight (weekend, supervised) visits with the children. She was seeing the children daily, helping transport them to and from school and some of their activities. However, Ashley tested positive for methamphetamine at some point in December 2023, and agency-supervised visits resumed. After that, Ashley was no longer allowed overnight visits and was ordered not to transport the children. At the time of the termination hearing, Ashley was allowed three agency-supervised visits per week.

According to Martinez, the children were doing quite well in their foster placement. The children were involved in "several activities," their performance at school increased, and their previously identified negative behaviors had been reduced. The children's foster mother provided more details about Ashley's interactions with the children while in foster care. During the time the foster mother supervised visits, Ashley also participated in some video or telephone visits with the children. Toward the end of 2023, when Ashley's visits with the children increased, she would come over in the mornings before work and have breakfast with the children and would sometimes bathe them in the evenings. During the periods when Ashley's visits were unsupervised, she was excited to be able to sometimes transport the children to or from school and attend parent/teacher conferences.

The foster mother noted that Ashley's visitation attendance during the case had sometimes been "sporadic" and was not always "very consistent." The foster mother testified, however, that Ashley did not always have available transportation and that the supervision agency sometimes had staffing issues that interfered with visitation. She stated that the children look forward to visits and are "sad" on occasions when they cannot see Ashley. She stated, however, that the children only ask about Ashley when they are going to see her.

Ashley has attended some of the children's extracurricular activities during this case, including karate for Jordan and gymnastics for Madison. Other than "maybe" one doctor's appointment when Madison was sick, Ashley had not attended any of the children's medical, dental, or eye appointments. The foster mother agreed, however, that she might not have provided Ashley with information about when children's checkups were scheduled. Ashley has sent the children some cards and inexpensive gifts during their time in foster care.

Teresa Drelicharz became the children's therapist in March 2023. She understood that the children had recently been through "a traumatic situation" where they were removed from their mother's care. Jordan and Madison were ages 6 and 5, respectively, at the time. Drelicharz conducted play therapy with them, initially every week; their sessions had been reduced to every 2 weeks by the time of the termination hearing. Drelicharz had not yet recommended family therapy for Ashley and the children because Ashley needed to address her own healing and treatment first.

Drelicharz diagnosed Madison with "[a]djustment disorder with anxiety, anxious mood." Madison's therapy goals were focused toward easing her anxiety level and treating her separation anxiety. According to Drelicharz, Madison "needed to be in control" and "wanted to run the show" during therapy, which Drelicharz attributed to Madison feeling "so out of control and a little bit insecure" about "what's going to happen to [her]." Drelicharz testified that Madison's behaviors have improved, that her need to be in control has lessened, and that she has "stabilized" during therapy. Drelicharz attributed Madison's progress on her therapeutic goals to the environment in her foster care placement. According to Drelicharz, Madison has had time to really learn to trust and feel secure and that if the current stability and structure in her life were not maintained, she would have to start over with her trauma healing.

When Jordan began therapy with Drelicharz, he was having problems with anger at school and disrespect at home in his foster placement. Drelicharz diagnosed Jordan with "[a]djustment disorder with mixed emotions and conduct." Jordan's therapy goals were aimed at reducing some behaviors he displayed at school, such as disrupting class and fighting with other kids, reducing his "verbal aggression" toward his foster placement, and gaining more understanding about what was happening in his life. According to Drelicharz, Jordan needed to understand that even if his parents were not available, somebody was taking care of him and would continue to do so. During play therapy, Jordan utilized puppets and expressed that they wanted to "have a puppet fight." This signified to Drelicharz that Jordan was experiencing "some aggression" and "things were happening for him that were unsettling." Drelicharz testified that Jordan has made progress in his therapeutic goals, in part due to the love and security he receives in his foster placement and his foster parents' ability to make him feel safe. Although Jordan still struggled in school with peer relationships, his "real acting out" had "eased up" and his behaviors were more in line with those of "an eight-year-old boy that has had a little bit of chaos in his life and . . . is still dealing with

regular eight-year-old stuff." As with Madison, Drelicharz indicated that a disruption to the stability and structure in Jordan's foster placement would "severely impact" his life and impede his trauma healing.

### (v) Cooperation With Family Support/Case Professionals

Ashley participated in and was successfully discharged from family support services between February and July 2023. The Department referred Ashley for family support again at later points in the case, but Ashley "did not feel she needed a family support worker" and denied the care. Martinez indicated that family support services could have helped Ashley with issues such as housing and income concerns and locating an appropriate treatment program.

Martinez testified that Ashley's contact with her had not always been consistent. Difficulties included occasions when Ashley did not have access to Wi-Fi, as well as the fact that Ashley had several different phone numbers during this case. Martinez noted that Ashley would try to reach out via email when she did not have a phone and that she reached out when incarcerated. Martinez described Ashley as difficult to communicate with, noting that Ashley "will get very aggressive and combative" if Martinez disagrees with something Ashley wants to do. Martinez testified that she felt threatened by Ashley when communicating with her over text. The juvenile court received copies of certain text message communications between Ashley and Martinez, which show Ashley's use of vulgar and sometimes threatening language toward Martinez on those occasions.

### (vi) Best Interests

Martinez expressed her opinion that Ashley had not been compliant with the juvenile court's orders for reunification and had not placed herself in a position to parent the children. She expressed her concern about Ashley's fitness as a parent because Ashley had not shown she could maintain her sobriety, had not shown she could obtain and maintain employment or housing for herself and the children, and had not taken accountability for why the children came into the Department's care. Based on the time the children have been in out-of-home care, Ashley's lack of progress, and Ashley's inability to maintain sobriety or comply with court orders, Martinez felt that termination of Ashley's parental rights would be in the children's best interests. Drelicharz also testified that termination of Ashley's parental rights would be in the children's best interests, given the duration of the case, Ashley's unsuccessful attempts toward reunification, and the children's need for certainty and permanency.

### (vii) Ashley's Evidence

Ashley did not call any witnesses to testify on her behalf. She did offer certain exhibits, which the juvenile court received without objection. Specifically, Ashley offered certificates of completion for a "Parent Education and Family Stabilization Course" and a "Parenting Course," both of which she completed in May 2023, and her completion of 4 weeks of "MINDFULLNESS & WELLBEING INSTRUCTION" in September 2024. She also reoffered the letter from the program director confirming her enrollment in a treatment program. The letter stated that Ashley was admitted to an outpatient treatment program on January 29, 2025, was expected to complete the "(PHP) treatment episode" on March 12, and "should transition" into the "IOP treatment

program for up to an additional 12 weeks" to be determined upon her completion of "PHP program." The letter also noted that Ashley reported she had moved into "Oxford house which promotes sober living" and that Ashley had been "engaged and participating in group and individual sessions."

### (c) Order

On March 13, 2025, the juvenile court entered an order terminating Ashley's parental rights to her children. The court found the testimony of the State's witnesses to be credible and probative. The court noted that Ashley's use of controlled substances was the primary basis for the children's removal from her care in January 2023 and that this continued to be an ongoing issue for Ashley. The court noted evidence of Ashley's admissions to the foster mother and Martinez of her recent use of illegal controlled substances and her failure to continuously submit to drug testing since the children's removal, as well as her failure to submit to hair follicle or fingernail drug testing and steps she took "to avoid and purposely impede" that testing process. The court also noted Ashley's enrollment in and failure to complete multiple treatment programs; her failure to demonstrate any period of sobriety or compliance with drug testing, except during her brief times in drug treatment programs; and her failure to comply with the majority of the other rehabilitative court orders and to alleviate the safety risks existing at the time of the children's removal from her care. The court found clear and convincing evidence to support termination of Ashley's parental rights under § 43-292(2), (6), and (7), that she was unfit, and that termination of her parental rights was in the children's best interests. With respect to the specific allegations under § 43-292(6), the court dismissed the counts alleging Ashley's failure to obtain and maintain a legal source of income and provide proof to the case manager, failure to consistently visit her children, and failure to maintain consistent contact with case professionals for insufficient evidence.

### III. ASSIGNMENTS OF ERROR

Ashley assigns, restated, that the juvenile court erred in (1) finding clear and convincing evidence to terminate her parental rights pursuant to § 43-292(2), (6), and (7) and (2) finding that termination of her parental rights was in the children's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

### V. ANALYSIS

#### 1. STATUTORY GROUNDS

Ashley assigns that the juvenile court erred in finding clear and convincing evidence to terminate her parental rights pursuant to § 43-292(2), (6), and (7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Ashley's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the

record clearly shows that statutory grounds for termination of her parental rights exist under § 43-292(7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Ashley acknowledges that the children have been in out-of-home placement for more than 15 months, but she nonetheless argues that the juvenile court erred in finding clear and convincing evidence to terminate her parental rights under § 43-292(7). In support of this argument, Ashley asserts that the fact a child has been placed outside the home for 15 or more of the most recent 22 months does not demonstrate parental unfitness, but instead, merely provides a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

We agree that a child's placement outside the home for 15 or more of the most recent 22 months does not necessarily demonstrate parental unfitness. See *id.* Regardless of the length of time a child is placed outside the home, it is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody. *Id.* In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). We have addressed Ashley's arguments with respect to parental unfitness and best interests below.

The children were removed from Ashley's care on January 26, 2023, and placed in the Department's custody. The children have been in out-of-home placement continuously since that time. At the time the termination motion was filed on October 10, 2024, the children had been in out-of-home care for more than 20 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Ashley's parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) and (6), but we do not need to consider whether termination of Ashley's parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of J'Endlessly F. et al.*, 26 Neb. App. 497, 920 N.W.2d 858 (2018).

### 2. BEST INTERESTS AND UNFITNESS

Ashley assigns that the juvenile court erred in finding that termination of her parental rights was in the children's best interests.

In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. See *In re Interest of Noah C., supra*. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.* Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

Ashley argues that given her "demonstrable efforts" and the evidence of a "positive, beneficial relationship" between her and the children, the juvenile court's finding that termination of her parental rights was in the children's best interests was not supported by the requisite clear and convincing evidence. Brief for appellant at 24. We agree that Ashley has a beneficial relationship with the children and her interactions with them during visitation have been largely positive. Ashley made reasonable progress toward at least some of her case plan goals during 2023, achieving unsupervised and overnight visits with the children. However, this progress stopped in late 2023 after Ashley tested positive to methamphetamine and her progress since that time has been inconsistent and/or poor. The children were removed from Ashley's care in January 2023 due to concerns over Ashley's drug use, and Ashley's drug use has remained a significant ongoing concern throughout this case. Although Ashley had entered another treatment program at the time of the termination hearing, and appeared to be participating fully, there is nothing to show whether Ashley completed that program or how long after completion it would take for her to be in a position to safely parent the children.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights, and last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Further, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L., supra*. We conclude that the State showed clear and convincing evidence that Ashley was unfit, and that termination of her parental rights was in the children's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Ashley's parental rights to her minor children.

AFFIRMED.